## AINSA *v.* NEW MEXICO AND ARIZONA RAILROAD COMPANY.

### APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF ARIZONA.

No. 1.   Submitted March 8, 16, 1897. — Decided October 13, 1899.

Since the act of Congress of March 3, 1891, c. 539, establishing the Court of Private Land Claims, the courts of the Territory of Arizona have jurisdiction, as between private parties, to determine whether a title under a Mexican grant, which has not been confirmed or rejected by, and is not pending before Congress, and which is asserted to have been complete and perfect by the law prevailing in New Mexico before the cession of the country to the United States, was complete and perfect before the cession.

THE case is stated in the opinion.

*Mr. Rochester Ford* for Ainsa.

*Mr. Solicitor General* and *Mr. Matthew G. Reynolds* for the United States.

MR. JUSTICE GRAY delivered the opinion of the court.

This was a complaint, filed June 1, 1892, in a district court of the Territory of Arizona and county of Pima, by Santiago Ainsa, administrator with the will annexed of Frank Ely, against the New Mexico and Arizona Railroad Company, to quiet the plaintiff's title in a tract of land in that county, known as the rancho San José de Sonoita, under a grant made by the Mexican Government to Leon Herreros on

May 15, 1825, which was alleged to have vested a complete and perfect title in fee in the grantee.

The defendant denied the plaintiff's title; and asserted a right of way over the land under condemnation proceedings against persons who had entered thereon as preëmption or homestead settlers, claiming that it was public land of the United States.

· The parties waived a trial by jury, and submitted the case to the judgment of the court upon an agreed statement of facts, which set forth what was admitted to be a correct translation of the "title deeds of a grant of one sitio, and three fourths of another sitio, surveyed on behalf of Don Leon Herreros, resident of Tubac, situated in a place called San José de Sonoita" — consisting of the petition of Herreros to the intendente of the province of Sonora and Sinaloa; an order of the intendente for an official survey and valuation of the land; its survey and location by metes and bounds; the delivery of juridical possession to Herreros; a valuation of the land; a reference of the expediente to the promoter fiscal for examination, and his report recommending a sale by auction; a sale by auction to Herreros, after due publication of notice; the intendente's approval of the proceedings; payment by Herreros of the amount of the valuation, with fees and costs; a grant to him by the commissary general in the usual form; and a record of the grant in the Mexican archives. It was agreed that these papers were executed and delivered according to their purport, and that the plaintiff was the vendee and assignee of all the right, title and interest of Herreros.

It was also agreed that a petition for the confirmation by Congress, under the acts of July 22, 1854, c. 103, § 8, (10 Stat. 309,) and July 15, 1870, c. 292, § 1, (16 Stat. 304,) of the Mexican grant, was filed on December 29, 1879, in the office of the United States surveyor general for the Territory of Arizona, but was never acted on by Congress; and that, at the time of the commencement of this suit, no proceedings for the confirmation of the grant were pending before Congress, or before any surveyor general of the United States, or before the Court

of Private Land Claims created by the act of March 3, 1891, c. 539. 26 Stat. 854.

It was also agreed that, before the commencement of this suit, certain persons named had entered upon the several tracts of the granted land, as preëmption or homestead settlers, claiming them to be public lands of the United States; and that thereafter, and before the commencement of this suit, the defendant, by condemnation proceedings against, and mesne conveyances from, those persons, acquired and now claimed a right of way through those tracts and within the limits of the grant.

The parties further stipulated that "this statement of facts is for the purpose of this suit only, and nothing herein agreed upon shall be taken as admitted for or against either of the parties hereto in any other proceeding whatever."

The district court held that it had no jurisdiction, because the plaintiff claimed title under a Mexican grant which had not been confirmed by Congress, and therefore dismissed the suit; and its judgment was affirmed by the Supreme Court of the Territory. 36 Pacific Reporter, 213. The plaintiff appealed to this court.

The case was originally submitted to this court upon a brief for the appellant only, without any opposing brief. But it was afterwards submitted anew upon the appellant's brief, as well as a brief which the court allowed to be filed in behalf of the United States, because of their interest in the question involved, and of their being a party to a suit, involving the validity of the same Mexican grant, brought by the United States against this appellant in the Court of Private Land Claims, and since decided by this court and reported. *Ely's Administrator* v. *United States*, (1898) 171 U. S. 220.

The question of jurisdiction presented by the record depends upon the effect of the treaty between the United States and Mexico of December 30, 1853, (known as the Gadsden treaty,) and of the acts of Congress above cited; and may be conveniently approached by first referring to the decisions of this court under various treaties by which the United States have acquired territory from France, Spain and Mexico.

Private rights of property in land lying within a territory ceded by one independent nation to another by a treaty between them are not affected by the change of sovereignty and jurisdiction; and are entitled to protection, whether they are complete and absolute titles, or merely equitable interests needing some further act of the government to perfect the legal title.    The duty of securing such rights, and of fulfilling the obligations imposed upon the United States by the treaty, belongs to the political department; and Congress may either itself discharge that duty, or delegate its performance to a strictly judicial tribunal or to a board of commissioners. *United States* v. *Percheman*, (1833) 7 Pet. 51, 86, 87; *Delassus* v. *United States*, (1835) 9 Pet. 117, 133; *Strother* v. *Lucas*, (1838) 12 Pet. 410, 438; *Astiazaran* v. *Santa Rita Mining Co.*, (1893) 148 U. S. 80–82, and cases there cited; *Stoneroad* v. *Stoneroad*, (1895) 158 U. S. 240, 248; *Rio Arriba Co.* v. *United States*, (1897) 167 U. S. 298, 309.    As was said by this court, speaking by Mr. Justice Trimble, in a leading case: "It may be admitted that the United States were bound, in good faith, by the terms of the treaty of cession by which they acquired the Floridas, to confirm such concessions as had been made by warrants of survey; yet it would not follow that the legal title would be perfected until confirmation.    The Government of the United States has throughout acted upon a different principle in relation to these inchoate rights, in all its acquisitions of territory, whether from Spain or France. Whilst the Government has admitted its obligation to confirm such inchoate rights or concessions as had been fairly made, it has maintained that the legal title remained in the United States until, by some act of confirmation, it was passed or relinquished to the claimants.    It has maintained its right to prescribe the forms and manner of proceeding in order to obtain a confirmation, and its right to establish tribunals to investigate and pronounce upon their fairness and validity." *De la Croix* v. *Chamberlain*, (1827) 12 Wheat. 599, 601.    Even grants which were complete at the time of the cession may be required by Congress to have their genuineness and their extent established by proceedings in a particular manner before

they can be held to be valid.   But where no such proceedings are expressly required by Congress, the recognition of grants of this class in the treaty itself is sufficient to give them full effect.

The treaty of April 30, 1803, between the United States and the French Republic, by which the Province of Louisiana was ceded to the United States, provided, in article 3, as follows: " The inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages and immunities of citizens of the United States; and in the mean time they shall be maintained and protected in the free enjoyment of their liberty, property and the religion they profess." 8 Stat. 202.   By the act of March 2, 1805, c. 26, § 1, it was provided that persons who before October 1, 1800, being of full age and actually inhabiting and cultivating lands within the territories ceded by that treaty, had obtained a " duly registered warrant or order of survey " from the Spanish or French Government while in possession of those territories, should " be confirmed in their claims in the same manner as if their titles had been completed."   Section 4 provided that before March 1, 1806, persons claiming lands by virtue of a completed grant might file it, and persons claiming under an incomplete title should file all papers relating to it, with the register of the local land office.   And by section 8, commissioners were to be appointed by the President with power to hear evidence and to decide in a summary way upon the validity of the claims, and to report to Congress all claims confirmed or rejected, and with the latter the evidence adduced in their support. 2 Stat. 324–327.   The act of March 26, 1824, c. 173, enacted that it should " be lawful for any person " claiming lands in the State of Missouri " by virtue of any French or Spanish grant, concession, warrant or order of survey, legally made, granted or issued by the proper authorities " before March 10, 1804, " and which was protected or secured by the treaty " aforesaid " and which might have been perfected into a complete title, under and in conformity to the laws, usages and cus-

toms, under the government under which the same originated, had not the sovereignty of the country been transferred to the United States," to present a petition, within two years from the passage of the act, to the District Court of the United States for the District of Missouri, for the confirmation of such claim; that court was given authority to hear evidence and pass upon the claim; and from its decision an appeal might be taken within a year to this court. 4 Stat. 52. The provisions of that act were extended to the States of Louisiana and Arkansas, and to parts of Mississippi and Alabama, by the act of June 17, 1844, c. 95, § 1. 5 Stat. 676. Under those statutes, it was uniformly held by this court that the jurisdiction of the District Court of the United States was limited to suits by persons, who had only an inchoate and equitable title, to obtain an absolute and legal one; and did not extend to a title which was complete and perfect when the treaty took effect; and the reason of those decisions, as declared by Chief Justice Taney speaking for the whole court, was that such a title "is protected by the treaty, and is independent of any legislation by Congress, and requires no proceeding in a court of the United States to give it validity." *United States* v. *Pillerin*, (1851) 13 How. 9; *United States* v. *McCullagh*, (1851) 13 How. 216. So in *United States* v. *d'Auterieve*, (1853) 15 How. 14, Mr. Justice Nelson, delivering the opinion of the majority of the court, said that the title of the petitioners, "if still a subsisting one in them, is a complete and perfect one, and consequently not within the first section of that act [of 1844] which confers the jurisdiction upon this court. The place to litigate it is in the local jurisdiction of the State, by the common-law action of ejectment, or such other action as may be provided for the trial of the legal titles to real estate." 15 How. 23, 24. And Mr. Justice Curtis and three other dissenting justices concurred in the judgment on that ground only. 15 How. 29. See also *United States* v. *Roselius*, (1853) 15 How. 36, 38; *Maguire* v. *Tyler*, (1869) 8 Wall. 650, 652; *Dent* v. *Emmeger*, (1871) 14 Wall. 308, 312; *Trenier* v. *Stewart*, (1879) 101 U. S. 797, 802. And the courts of the State of Louisiana habitually exercised jurisdiction to

try and determine such titles. *Lavergne* v. *Elkins*, (1841) 17 Louisiana, 220, 230; *Murdock* v. *Gurley*, (1843) 5 Rob. (La.) 457, 466; *Jewell* v. *Porche*, (1847) 2 La. Ann. 148; *Riddle* v. *Ratliff*, (1853) 8 La. Ann. 106.

The treaty of February 22, 1819, by which the King of Spain ceded East and West Florida to the United States, provided, in article 8, as follows: "All the grants of land made before the 24th of January, 1818, by his Catholic Majesty, or by his lawful authorities, in the said territories ceded by his Majesty to the United States, shall be ratified and confirmed to the persons in possession of the lands, to the same extent that the same grants would be valid if the territories had remained under the dominion of his Catholic Majesty." 8 Stat. 258. In *United States* v. *Percheman*, (1833) 7 Pet. 51, this court, speaking by Chief Justice Marshall, said: "A cession of territory is never understood to be a cession of the property belonging to its inhabitants. The King cedes that only which belonged to him. Lands he had previously granted were not his to cede. Neither party could so understand the cession. Neither party could consider itself as attempting a wrong to individuals, condemned by the practice of the whole civilized world." "This article is apparently introduced on the part of Spain, and must be intended to stipulate expressly for that security to private property which the laws and usages of nations would, without express stipulation, have conferred. No construction, which would impair that security further than its positive words require, would seem to be admissible. Without it, the titles of individuals would remain as valid under the new government as they were under the old; and those titles, so far at least as they were consummate, might be asserted in the courts of the United States, independently of this article." 7 Pet. 86, 87. And it was accordingly held that a Spanish grant which was complete before the date mentioned in the treaty was confirmed by the treaty itself, needed no confirmation by Congress, and was not impaired by its rejection by the commissioners appointed by the President under authority of Congress to examine claims to lands in Florida. See also *United States* v. *Arredondo*, (1832)

6 Pet. 691; *United States* v. *Wiggins,* (1840) 14 Pet. 334, 349.

The treaty of Guadalupe Hidalgo of February 2, 1848, by which the United States acquired California, as well as much of the present Territories of New Mexico and Arizona, from Mexico, provides, in article 8, that the property of Mexicans within the territory ceded "shall be inviolably respected," and they and their heirs and grantees "shall enjoy, with respect to it, guaranties equally ample as if the same belonged to citizens of the United States;" and, in article 9, that "Mexicans who, in the territories aforesaid, shall not preserve the character of citizens of the Mexican Republic conformably with what is stipulated in the preceding article, shall be incorporated into the Union of the United States, and be admitted at the proper time (to be judged of by the Congress of the United States) to the enjoyment of all the rights of citizens of the United States, according to the principles of the Constitution; and in the mean time shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction."    9 Stat. 929, 930.

By the act of March 3, 1851, c. 41, entitled "An act to ascertain and settle private land claims in the State of California," it was provided, in section 8, that "each and every person claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government," should present the same to commissioners, to be appointed by the President under the first section of the act; and, by subsequent sections, that the commissioners should decide upon the validity of each claim, and certify their decision, within thirty days, to the District Court of the United States; that the District Court, on the petition of either the claimant or the United States, might review the decision of the commissioners; that an appeal might be taken from the decision of the District Court to this court; that any final decision should be conclusive between the claimant and the United States only, and should not affect third parties, unless they should intervene in the District Court, for which provision was made';

and that "all lands, the claims to which shall not have been presented to the said commissioners within two years after the date of this act, shall be deemed, held and considered as part of the public domain of the United States." 9 Stat. 631–633. This court held that this provision included perfect as well as inchoate titles, and that consequently no suit could be maintained in a court of the State of California on any Spanish title whatsoever, if it had not been presented to the commissioners in accordance with the act of Congress. *Botiller* v. *Dominguez,* (1889) 130 U. S. 238, 252–254, and cases there cited. As was observed by Chief Justice Taney, in *Fremont* v. *United States,* (1854) 17 How. 542, 553, 554, and repeated by Mr. Justice Miller, in *Botiller* v. *Dominguez,* above cited, " The eighth section embraces not only inchoate or equitable titles, but legal titles also ; and requires them all to undergo examination, and to be passed upon by the court." " In this respect it differs from the act of 1824, under which the claims in Louisiana and Florida were decided. The jurisdiction of the court, in these cases, was confined to inchoate equitable titles, which required some other act of the Government to vest in the party the legal title or full ownership. If he claimed to have obtained from either of the former governments a full and perfect title, he was left to assert it in the ordinary forms of law, upon the documents under which he claimed."

The treaty of December 30, 1853, (known as the Gadsden treaty,) by which the Mexican Republic ceded to the United States additional territory now within the Territories of New Mexico and Arizona, including the land in controversy in this case, provides, in article 5, that all the provisions of the eighth and ninth articles of the treaty of Guadalupe Hidalgo shall apply to the territory thus ceded, "and to all the rights of persons and property, both civil and ecclesiastical, within the same, as fully and as effectually as if the said articles were herein again recited and set forth ; " and, in article 6, that "no grants of land within the territory ceded," bearing date since September 25, 1853, "will be considered valid or be recognized by the United States, or will any grants made

previously be respected or be considered as obligatory which have not been located and duly recorded in the archives of Mexico." 10 Stat. 1035. This last clause has been held by this court to require an authentic survey and final determination of the location and boundaries of the claim. *Ainsa* v. *United States*, (1895) 161 U. S. 208, 222. But in the case at bar the plaintiff set up a completed grant, surveyed and located by definite boundaries long before September 25, 1853.

The act of Congress of July 22, 1854, c. 103, provided for the appointment of surveyor general for New Mexico, (which then included what is now the Territory of Arizona,) and, by section 8, made it his duty, "under such instructions as may be given by the Secretary of the Interior, to ascertain the origin, nature, character and extent of all claims to lands under the laws, usages and customs of Spain and Mexico;" authorized him, for this purpose, to issue notices, summon witnesses, administer oaths and do all other necessary acts; and directed that he should make a full report, according to a form to be prescribed by the Secretary of the Interior, "on all such claims as originated before the cession of the territory to the United States by the treaty of Guadalupe Hidalgo of 1848, denoting the various grades of title, with his decision as to the validity or invalidity of each of the same, under the laws, usages and customs of the country before its cession to the United States;" that his report should "be laid before Congress, for such action thereon as may be deemed just and proper, with a view to confirm *bona fide* grants, and give full effect to the treaty of 1848;" and that, "until the final action of Congress on such claims, all lands covered thereby shall be reserved from sale or other disposal by the Government." 10 Stat. 308, 309. And by the Sundry Civil Appropriation Act of July 15, 1870, c. 292, it was enacted that the surveyor general of the Territory of Arizona, as to lands in that territory, should have all the powers conferred and perform all the duties enjoined upon the surveyor general of New Mexico by the act of 1854; and that his report should be laid before Congress, for such action thereon as should be deemed just and proper. 16 Stat. 304.

Under those provisions of the acts of 1854 and 1870, it was held by this court that a claim reported by the surveyor general to Congress, and which had been confirmed by Congress, or upon which Congress had not acted, was not within the jurisdiction of the ordinary courts of justice. *Tameling* v. *United States Freehold Co.*, (1876) 93 U. S. 644; *Astiazaran* v. *Santa Rita Mining Co.*, 148 U. S. 80, above cited.

But this court has never decided the question whether a claim under a Mexican grant, which was complete and perfect before the treaty of Guadalupe Hidalgo took effect, and no claim for which was pending either before the surveyor general or before Congress, could be asserted in the ordinary courts of justice while those provisions of the acts of 1854 and 1870 were in force. Nor is it necessary now to consider that question, because those provisions have been superseded and repealed by the act of March 3, 1891, c. 539, establishing the Court of Private Land Claims. 26 Stat. 854.

By section 6 of this act, " it shall and may be lawful for any person or persons or corporation, or their legal representatives, claiming lands within the limits of the territory derived by the United States from the Republic of Mexico, and now embraced within the territories of New Mexico, Arizona or Utah, or within the States of Nevada, Colorado or Wyoming, by virtue of any such Spanish or Mexican grant, concession, warrant or survey as the United States are bound to recognize and confirm by virtue of the treaties of cession of said country by Mexico to the United States, which at the date of the passage of this act have not been confirmed by act of Congress, or otherwise finally decided upon by lawful authority, and which are not already complete and perfect, in every such case to present a petition in writing to the said court," which is authorized, after notice to any adverse possessor or occupant, and to the attorney for the United States, and full legal proof and hearing, to enter a decree confirming or rejecting the claim.

By section 7, " all proceedings subsequent to the filing of said petition shall be conducted as near as may be according to the practice of the courts of equity of the United States; "

and the court is authorized " to hear and determine all questions arising in cases before it, relative to the title to the land the subject of such case, the extent, location and boundaries thereof, and other matters connected therewith fit and proper to be heard and determined, and by a final decree to settle and determine the question of the validity of the title and the boundaries of the grant or claim presented for adjudication, according to the law of nations," the stipulations of the treaties between the United States and Mexico of 1848 and 1853, "and the laws and ordinances of the government from which it. is alleged to have been derived, and all other questions properly arising between the claimants or other parties in the case and the United States."

By section 8, "any person or corporation claiming lands in any of the States or Territories mentioned in this act under a title, derived from the Spanish or Mexican government, that was complete and perfect at the date when the United States acquired sovereignty therein, shall have the right (but shall not be bound) to apply to said court, in the manner in this act provided for other cases, for a confirmation of such title; and on such application said court shall proceed to hear, try and determine the validity of the same, and the right of the claimant thereto, its extent, location and boundaries, in the same manner and with the same powers as in other cases in this act mentioned."   "And no confirmation of claims or titles. in this section mentioned shall have any effect other or further than as a release of all claim of title by the United States; and no private right of any person, as between himself and other claimants or persons, in respect of any such lands, shall be in any manner affected thereby."

That section further provides that the United States may "file in said court a petition against the holder or possessor of any claim or land in any of the States or Territories mentioned in this act, who shall not have voluntarily come in under the provisions of this act, stating in substance that the title of such holder or possessor is open to question, or stating in substance that the boundaries of any such land, the claimant or possessor to or of which has not brought the matter into court,

are open to question, and praying that the title to any such land, or the boundaries thereof, if the title be admitted, be settled and adjudicated; and thereupon the court shall, on notice to such claimant or possessor as it shall deem reasonable, proceed to hear, try and determine the questions stated in such petition or arising in the matter, and determine the matter according to law, justice and the provisions of this act, but subject to all lawful rights adverse to such claimant or possessor, as between such claimant and possessor and any other claimant or possessor."

By section 9, either party against whom the Court of Private Claims decides may appeal to this court.

By section 13, all the foregoing proceedings and rights are to be conducted and decided subject to several provisions, among which are the following:

"First. No claim shall be allowed that shall not appear to be upon a title lawfully and regularly derived from the Government of Spain or Mexico, or from any of the States of the Republic of Mexico having lawful authority to make grants of land, and one that, if not then complete and perfect at the date of the acquisition of the territory by the United States, the claimant would have had a lawful right to make perfect, had the territory not been acquired by the United States, and that the United States are bound, upon the principles of public law, or by the provisions of the treaty of cession, to respect and permit to become complete and perfect if the same was not at said date already complete and perfect."

"Fourth. No claim shall be allowed for any land the right to which has hitherto been lawfully acted upon and decided by Congress, or under its authority.

"Fifth. No proceeding, decree or act under this act shall conclude or affect the private rights of persons as between each other, all of which rights shall be reserved and saved to the same effect as if this act had not been passed; but the proceedings, decrees and acts herein provided for shall be conclusive of all rights as between the United States and all persons claiming any interest or right in such lands."

"Eighth. No concession, grant or other authority to acquire

land, made upon any condition or requirement, either antecedent or subsequent, shall be admitted or confirmed unless it shall appear that every such condition and requirement was performed within the time and in the manner stated in any such concession, grant or other authority to acquire land."

The only authority given by this act to the surveyor general of a Territory or State is by section 10, which requires him, after a final decree of confirmation by the Court of Private Land Claims, and under the direction of the Commissioner of the General Land Office, to make a survey and return it to said commissioner, by whom it is to be transmitted to that court for its approval or correction. And section 15 expressly repeals section 8 of the act of July 22, 1854, " and all acts amendatory or in extension thereof, or supplementary thereto, and all acts or parts of acts inconsistent with the provisions of this act."

The effect of these provisions of the act of 1891 is, that all prior acts of Congress providing for the assertion, whether in a judicial tribunal or before a surveyor general and Congress, of either complete or incomplete Mexican grants, are repealed, except as to claims previously acted upon and decided by Congress or under its authority ; that all incomplete claims against the United States, coming within the provisions of the act, must be presented to the Court of Private Land Claims ; that any one claiming land under a Mexican grant, which was complete and perfect at the time of the cession of sovereignty, " shall have the right (but shall not be bound) to apply to said court," as in cases of incomplete grants ; that the United States, however, may file a petition in that court " against the holder or possessor of any claim or land," which would doubtless include titles claimed to be complete, as well as those which were incomplete, at the time of the cession ; and that all decisions under this act shall be conclusive between the claimants and the United States only, and shall not affect the private rights of any person, as between himself and any other claimant.

In short, the United States, at their election, may have the validity of any Mexican grant, whether complete or incom-

plete, determined by the Court of Private Land Claims, so far as concerns the interest of the United States; and proceedings to establish against the United States private titles claimed under incomplete Mexican grants are within the exclusive jurisdiction of that court; but the private holder of any complete and perfect Mexican grant may, but is not obliged to, have its validity as against the United States determined by that court; and no rights of private persons, as between themselves, can be determined by proceedings under this act.

The result is that the United States, by the act of 1891, have prescribed and defined the only method by which grants incomplete before the cession can be completed and made binding upon the United States; but have neither made it obligatory upon the owner of a title complete and perfect before the cession to resort to this method, nor declared that his title shall not be valid if he does not do so.

A grant of land in New Mexico, which was complete and perfect before the cession of New Mexico to the United States, is in the same position as was a like grant in Louisiana or in Florida, and is not in the position of one under the peculiar acts of Congress in relation to California; and may be asserted, as against any adverse private claimant, in the ordinary courts of justice.

In the present case, the Mexican grant in question being asserted by the plaintiff to have been complete and perfect by the law prevailing in New Mexico before the cession of the country of the United States; and it being agreed that this grant had neither been confirmed nor rejected by Congress, and that no proceedings for its confirmation were pending before Congress or before the surveyor general at the time of the commencement of this suit; this court, for the reasons above stated, is of opinion that the courts of the Territory of Arizona had jurisdiction, as between these parties, to determine whether the grant was complete and perfect before the cession by Mexico to the United States.

Those courts having held otherwise,

*The judgment of the Supreme Court of the Territory of Ari-*

*zona, affirming the judgment of the district court of Pima County, is reversed, and the case remanded for further proceedings.*

MR. CHIEF JUSTICE FULLER dissented.

----

In No. 2, AINSA *v.* NEW MEXICO AND ARIZONA RAILROAD COMPANY, a similar case submitted by the same counsel at the same time, judgment was likewise reversed, MR. CHIEF JUSTICE FULLER dissenting.