# PUEBLO OF SANTA ROSA *v.* LANE.

TREATIES; INDIANS; CORPORATIONS; EQUITY; INJUNCTION; PUBLIC LANDS;
LIMITATION OF ACTIONS.

1. Title respected by treaty obligations is peculiarly sacred. It rests not only on the pledge of protection by the new sovereignty, but upon a solemn guaranty to the old sovereignty that existing personal and property rights shall remain undisturbed.

2. The lands in which the Indian pueblos of Arizona have had a communal right of property since time immemorial, and title to which was confirmed in them by the Guadalupe Hidalgo and Gadsden treaties, are not subject to entry or listing for entry and sale as part of the public domain of the United States, and Congress never having legislated in respect to the property rights of the pueblos in such lands, the administrative officers of the government have no authority to interfere in any respect with such rights.

3. An Indian, though a ward of the government, may possess title to lands.

4. The Indian pueblo of Santa Rosa, in Pima county, Arizona, is a corporation with power to sue and be sued as such, under the Kearney Statute, constituting the Pueblo Indians of New Mexico bodies politic and corporate (Laws of Mexico, 1851–2); the act of the first legislature of New Mexico continuing in force all territorial laws theretofore in force (id. 1852); the Act of Congress of August 4, 1854 (10 Stat. at L. 575, chap. 245), incorporating within the territory of New Mexico the land acquired under the Gadsden Treaty, subject to the laws of that territory, and the Act of Congress of February 24, 1863 (12 Stat. at L. 664, chap. 56), creating the Territory of Arizona and continuing in force and extending to that Territory the legislative enactments of New Mexico.

5. A suit by an Indian pueblo to enjoin the Secretary of the Interior and the Commissioner of the General Land Office from wrongfully undertaking in their official capacity to open its lands to sale, entry, and settlement as public land of the United States, is not a suit against the United States to control the discretionary functions of its officials, where it appears that the defendants are acting totally without their jurisdiction. . . . . . . .

6. A suit by an Indian pueblo of Arizona to enjoin the Commissioner of the General Land Office and the Secretary of the Interior from opening its land to entry, sale, and settlement as public land of the United States, is not barred because it failed to assert its title before the Land Commission created by the Act of Congress of July 22, 1854 (10 Stat. at L. 308, chap. 103), whose jurisdiction was limited to claims based on Mexican land grants within the limits of California, or the court of private land claims created by the Act of Congress of March 3, 1891 (26 Stat. at L. 854, chap. 539), which left it optional with claimants of land in certain territories, including Arizona, under Mexican grants, to assert title before that tribunal, without penalty or forfeiture for failure to do so.

7. *Quære,* as to the extent of the power of Congress to control the title of an Indian Pueblo to lands in which it has had communal rights since time immemorial, or to abolish its corporate existence.

No. 2981. Submitted March 6, 1917. Decided April 27, 1917.

HEARING on an appeal from a decree of the Supreme Court of the District of Columbia dismissing a bill in equity by an Indian pueblo of Arizona against the Secretary of the Interior and the Commissioner of the General Land Office to enjoin them from opening its lands to sale, entry, and settlement as public lands of the United States.                    *Reversed.*

The COURT in the opinion stated the facts as follows:

This is a suit in equity brought in the supreme court of the District of Columbia by plaintiff, the pueblo of Santa Rosa, to enjoin the Secretary of the Interior and the Commissioner of the General Land Office from undertaking in their official capacity to open its lands to sale, entry, and settlement as public lands of the United States.

It is averred in the bill that plaintiff is, and from time immemorial has been, a town known by the common name of pueblo of Santa Rosa, composed of civilized, sedentary, agricultural, and pastoral inhabitants, who are Pueblo Indians, and have been known as such, residing in permanent houses in a village of permanent location, built upon lands described in the bill, which are situated within the county of Pima, in the State of

Arizona, which lands, it is averred, were granted and conceded to said pueblo "by the laws and customs of the Indians antedating the Spanish discovery of America and also by the laws of Spain and Mexico." These lands are part of the territory ceded to the United States by the Gadsden Treaty. It is also averred that the inhabitants of this pueblo have from time immemorial lived in communal life, and have governed themselves and their community accordingly, with definite laws and customs having the force of law, which have always been obeyed by the inhabitants; and that at stated intervals they assemble in common council composed of the adult male inhabitants of the pueblo, and legislate on matters concerning the pueblo and its inhabitants by rules and decisions having the force of law.

It is also averred that "the laws and customs of the Indians and also the laws of Spain and of Mexico at all times conceded to the plaintiff, and the plaintiff claims and exercises, and from time immemorial has claimed and exercised, (1) the right to have a common name; to wit, the pueblo of Santa Rosa, and (2) the right and power to take, hold, manage, control, and dispose of real and personal property, including the land upon which said village is situated and the surrounding lands, and (3) the right and power to contract and otherwise act as an entity by resolutions passed in common councils composed of its adult male inhabitants, and through its officers and representatives, in all matters concerning its interests, property, and affairs, and (4) the right and power to have perpetual succession, and (5) the right and power to sue and be sued as an entity and to appear and act as such before courts and governmental authorities, and (6) the right and power to maintain a permanent town organization and government, and to make, at common councils of its inhabitants, rules and laws binding upon the pueblo and its inhabitants, and to be controlled and managed by its inhabitants acting together according to law and according to rules so made, and to elect and keep in office captains, alcaldes, and other town officers exercising much power and jurisdiction over said pueblo and its property and inhabitants for their common

benefit and for the maintenance of order, the preservation of its property, the promotion of its interests, and the conduct of its affairs. By reason of the facts above mentioned the plaintiff is, and from time immemorial has been, under the laws of Spain and Mexico and of the United States, an entity in fact and in law, and a juridical person entitled to sue as such."

It is also averred that the plaintiff occupies the same position and status as the Pueblo Indian towns of Mexico existing at the time of the Spanish discovery of America, and that "Spain during all the period of its sovereignty over the territory, including the land herein described, at all times recognized, and in no instance disputed, the ownership of said lands by the pueblo of Santa Rosa, and, by repeated royal orders and decrees, recognized the Papago Indians and the inhabitants of said pueblo as free vassals of the Spanish Crown, entitled to all the protection in their property rights which was accorded to Spanish subjects, and recognized and confirmed the ownership of plaintiff in said lands;" that, after the establishment of its sovereignty, Mexico recognized plaintiff's ownership of the land described, and during the period of Mexican sovereignty the inhabitants of the pueblo of Santa Rosa were recognized as Mexican citizens, enjoying property rights and other rights accorded to citizens of Mexico; that "at the time of the acquisition from Mexico by the United States of sovereignty over the territory comprising said land and at the time of the making of said treaties the said pueblo of Santa Rosa was the absolute owner, with complete, perfect, and indefeasible title to the land herein described, against all governments and individuals and all the world, except such rights as pertained to inhabitants of said pueblo as members thereof, and since said change of sovereignty this perfect title and ownership has continued to exist, and now exists. The inhabitants of said pueblo of Santa Rosa ever since said change of sovereignty have been, and now are, actually in possession, use, and occupation of all of said lands except in so far as recently they have been wrongfully disturbed in said use and occupation by trespassers without color of right or title;" and that, "by the terms of the treaties herein-

above mentioned, the ownership of its lands by said pueblo of Santa Rosa was forever guaranteed and secured to it by the United States."

It is also averred that in 1909 the then Secretary of the Interior designated plaintiff's lands as subject to entry under the Enlarged Homestead Act of February 19, 1909; that in 1914 plaintiff petitioned defendant Secretary, setting forth its grievances, and prayed that he and his agents "should abstain from listing for entry or sale as part of the public domain of the United States any part of said parcel of land belonging to the plaintiff, and from recommending the issuance of any patents covering any part of said land, and from surveying or making allotment surveys within the boundaries thereof." The Secretary on June 11, 1914, replied, denying plaintiff relief, "stating, among other things, that if the tenure of the holding of the Indians is not by grant emanating from the government of Spain or Mexico, it is not such a property right as was provided for and protected by the treaty, and that the mere possession of the land as Indian country, with the right of use, did not prevent it from passing under the dominion of the United States as public land, whatever the obligation of the United States to the Indians might be; and that no claim was presented by the Indians with reference to the lands in question to the surveyor general of Arizona under the Act of July 15, 1870, and that by the Act of March 3, 1891, a court of private land claims was created for the adjudication of all private land claims in Arizona, and that no claim appeared to have been presented to said court by the Indians, although it is provided by sec. 12 of said act that any claim not presented to such court within two years from the date of the act shall be deemed to be abandoned and shall be forever barred, and that said court having expired by limitation of law on June 30, 1904, any claim that the Indians may have can not be confirmed only by an act of Congress."

The prayer in broad terms is that defendants be restrained from treating the land as part of the public domain and exercising authority over it as such.

Defendants moved to dismiss the bill on the grounds that plaintiff is incapable of bringing or maintaining this suit, because not a body corporate; that it does not own the lands, but merely occupies them by sufferance as part of the public domain ceded to the United States by the Republic of Mexico as part of the Gadsden Purchase; that this, therefore, is a suit against the United States, and that the bill seeks to control the discretionary action of defendants.

From the decree sustaining the motion to dismiss this appeal was taken.

· *Mr. Henry P. Blair* and *Mr. Ralph S. Rounds,* for the appellant, in their brief cited:

*Ainsa* v. *N. M. & A. R. R. Co.* 175 U. S. 76; *Carino* v. *Insular Government,* 212 U. S. 449; *Lynn* v. *Nahant,* 113 Mass. 443; *Commonwealth* v. *Roxbury,* 75 Mass. 451; *Cherokee Nation* v. *Hitchcock,* 187 U. S. 300; *Crespin* v. *United States,* 168 U. S. 208, 218; *Devine* v. *Los Angeles,* 202 U. S. 313; *DeBaca* v. *Pueblo of Santo Domingo,* 10 N. M. 38; *Fletcher* v. *Fuller,* 120 U. S. 534; *Felix* v. *Patrick,* 36 Fed. 461, affirmed in 145 U. S. 317; *Gauthier* v. *Morrison,* 232 U. S. 452; *Governor* v. *Allen,* 8 Humph. 176; *Hill* v. *Boston,* 122 Mass. 349; *4th School Dist.* v. *Wood,* 13 Mass. 193; *Jaeger* v. *United States,* 29 Ct. Cl. 172; *Knight* v. *Land Asso.* 142 U. S. 161; *Leitensdorfer* v. *Webb,* 20 How. U. S. 176; *Los Angeles Mill. Co.* v. *Los Angeles,* 217 U. S. 217; *Laguna* v. *Acoma,* 1 N. M. 220; *Lane* v. *Watts,* 234 U. S. 525; *Merryman* v. *Bourne,* 9 Wall. 592; *Nambe* v. *Romero,* 10 N. M. 58; *Oaksmith* v. *Johnston,* 92 U. S. 343; *Ponce* v. *Roman Catholic Church,* 210 U. S. 296; *Pawlet* v. *Clark,* 9 Cranch, 292–328;. *Porter* v. *Sullivan,* 73 Mass. 441; *Palmer* v. *Low,* 98 U. S. 1; *Penny* v. *Coke Co.* 138 Fed. 769 (C. C. A.); *Pueblos of Santo Domingo & San Felipe* v. *United States,* 21 Sup. Ct. Rep. 915; *Richardson* v. *Ainsa,* 218 U. S. 289; *Re Kansas Indians,* 72 U. S. 734; *Spaulding* v. *Lowell,* 40 Mass. 78; *San Francisco* v. *United States,* Fed. Cas. No. 12, 316; *Sanchez* v. *Gonzales,* 11 Mart. (La.) 207; *Townsend* v.

*Greeley,* 5 Wall. 326; *New Mexico v. Delinquent Tax Payers,* 12 N. M. 139; *Terrett v. Taylor,* 9 Cranch, 43–46; *United States v. Pico,* 5 Wall. 536; *United States v. Lucero,* 1 N. M. 422; *United States v. Varela,* 1 N. M. 593; *United States v. Joseph,* 94 U. S. 614–619; *United States v. Santa Fé,* 165 U. S. 675, 710; *United States v. Chavez,* 175 U. S. 509, 520; *United States v. Devereaux,* — C. C. A. —, 90 Fed. 186; *United States v. Pendell,* 185 U. S. 189; *United States v. Boliller,* 130 U. S. 238; *United States v. Barker,* 181 U. S. 481–492; *United States v. Ritchie,* 17 How. (U. S.) 524–538; *United States v. Sandoval,* 231 U. S. 28; *United States v. Conway,* 175 U. S. 60; *Victor de la O. v. Acoma,* 1 N. M. 226; *Zia v. United States,* 168 U. S. 198.

*Mr. A. T. Vogelsang, Mr. Charles D. Mahaffie,* and *Mr. C. Edward Wright,* for the appellees:

1. The Papagos in no instance—the community at Santa Rosa or elsewhere—have ever presented any claim to any tract of land, professing to own the same, by reason of a grant from Spain or Mexico or otherwise. Unlike the Pueblos, they never availed themselves of any privilege, if they had such claims, accorded claimants under the Act of July 22, 1854 (10 Stat. at L. 308), or the act creating the court of private land claims (26 Stat. at L. 854). The Supreme Court of the United States has decided that a failure to avail oneself of these statutes for establishing title leaves the title in the United States. *Barker v. Harvey,* 181 U. S. 490.

2. Indian tribes, or bands of tribes, are dependent communities in all matters relating to their protection, etc., including the management of tribal property, subject to the supervision and control of the United States. *Cherokee Nation v. Georgia,* 5 Pet. 1; *United States v. Kagama,* 118 U. S. 375; *Choctaw Nation v. United States,* 119 U. S. 1; *Cherokee Nation v. Railroad,* 135 U. S. 641; *Stephens v. Cherokee Nation,* 174 U. S. 445; *Lone Wolf v. Hitchcock,* 187 U. S. 553; *Tiger v. Western Inv. Co.* 221 U. S. 286; *Heckman v. United States,* 224 U. S. 413.

The Papagos are Indians, and bear the same relation to United States as other tribes and bands of Indians. *United States* v. *Sandoval,* 231 U. S. 28; *United States* v. *Boyd,* 83 Fed. 547. By express provision of the Enabling Act and Constitution of Arizona, the exclusive jurisdiction of Congress over Indians and Indian lands in Arizona was continued. Act of June 20, 1910, 36 Stat. at L. 557, 569. Ariz. Const. art. 20.

3. An Indian tribe cannot sue or be sued in the courts of the United States or in a State court except where authority has been conferred by statute. 22 Cyc. 120–121, and cases cited. *Tebo* v. *Choctaw,* 66 Fed. 372; *Ligon* v. *Johnson,* 164 Fed. 670. A tribe of Indians within a State is not a corporation or even a quasi corporation. *Narragansett Indians,* 40 Atl. 347. Even where a State incorporates a band of Indians, that fact is without effect so far as it imports any change in the relations between the nation and the Indians. See *United States* v. *Boyd,* 83 Fed. 547, and especially at page 553.

4. Indian tribes possess merely an occupancy right, derived from original occupancy and possession, in the lands used by them. The fee remains in the United States (or in the State where the lands are situated in some instances). 22 Cyc. 123–124. The United States has power to dispose of public lands even within an Indian reservation without the consent of the Indians. 22 Cyc. 124. Where tribal Indians have been assigned lands and reservations as places of domicil, they have no vested right, but simply an occupancy right. 22 Cyc. 124, and cases cited.

5. Even if capacity to sue in a matter involving the validity of such a title as appellant asserts could be assumed, then the suit in effect would be one against the United States, as it is the United States through its Congress that is treating the Papagos as Indians and their lands as public lands subject to Papago occupancy; and the United States has not consented in this behalf to be sued. *Oregon* v. *Hitchcock,* 202 U. S. 60; *Louisiana* v. *Garfield,* 211 U. S. 70; *United States ex rel. Goldberg* v. *Secretary of Navy,* 231 U. S. 218.

D. C.]                    Opinion of the Court.

Mr. Justice Van Orsdel delivered the opinion of the Court:

The history and character of the Papago Indians may be gathered from a reference to certain public documents. In 1865, the first superintendent of Indians for Arizona states that "the early Spanish explorer found the Papagos here in 1540, and ruined houses of grand proportions attest their occupancy for thousands of years before the Spaniards came." Ex. Doc. 2d Sess. 38th Cong. vol. 5, Rep. Sec. of Int. p. 296.

In 1856 the Indian commissioner, in a report to Congress, said: "The Pueblo Indians maintain their character as peaceable, industrious communities. Some of them have lost the title papers for the grants of land obtained by them from Spain and Mexico. In such cases their agent has taken testimony in their behalf. They deserve the fostering care of the government, and Congress will no doubt confirm their titles. About five thousand Indians are embraced within the Gadsden Purchase. They are mostly Pueblos, and reside in six different villages. They have houses and flocks, and raise wheat and other products of the soil." Rep. Sec. of Int. Sen. Doc. 3d Sess. 34th Cong. vol. 2.

In the report of the Commissioner of Indian Affairs of 1856, at page 183, the following statement appears: "A large portion of this acquisition to our Indian population consists of Pueblos situated near Tucson.   *   *   *   They reside in permanent villages, have comfortable houses built of adobes, have flocks and herds around them, and rely upon the cultivation of the soil for subsistence,—raising wheat, corn, cotton, and other vegetables. They are divided into six pueblos or villages, but whether or not they hold their lands under grants from the former governments of their country, I am not informed; but presume they do, as they have been permanently settled for a great number of years."

M. C. Davidson, Indian Agent, at page 131 of the Report on Indian Affairs for 1865, said: "The status of the Papagos with respect to the soil ought to be determined in a way that no injustice will be done to them. The Mexican laws, based upon

the laws of the Indians promulgated by the Kings of Spain, recognized the Indians as subjects or citizens, and in most cases confirmed to them wherever they resided in fixed communities the titles to the lands where they lived. The Spaniards never made treaties with the Indians, nor extinguished the titles to the land, nor did they in any way recognize them as independent nations. Those who now, by the transfer of the political sovereignty of the country, find themselves upon American soil, and surrounded by Americans, look for at least a measure of recognition of their rights equal to that which they enjoyed under the despotic government of Spain. In my opinion, we must regard them as American citizens, and under certain conditions entitled to all their privileges." Rep. Sec. of Int. 1865, p. 299, Ex. Doc. 39th Cong. vol. 2.

It is conceded, as indeed it must be from a study of Spanish and Mexican history, that plaintiff pueblo has continuously occupied the valley of Santa Rosa from time immemorial. This logically brings us to a consideration of its legal status. We find that, under both Spanish and Mexican laws, extending from the Spanish invasion down to the cession to the United States, all Indian pueblos were accorded large legal and political privileges, with the power of having municipal self-governments and of choosing local officers with due relation to their responsibility to the public, and the power to hold property and to appear in court and sue and defend on their own behalf. Each pueblo held title to its land in common, and in general its political and legal status was that of a juridical entity. Indeed, after the Mexican succession, they were elevated to citizenship and civil rights. Hall's Mexican Laws, sec. 161.

The Laws of the Indies, which were begun by decree of Charles V. in 1543, and extended by subsequent decrees of the Spanish Kings, contain much in recognition of the right of Indian pueblos to their lands in Mexico. In bk. 4, title 12, Law 14 (1578), it is said: "Because we have wholly succeeded to the lordship of the Indies and because the public lands not granted away by the Kings, our predecessors, or by us, in our opinion belong to our patrimony and Royal Crown, it is suitable that

all the land which is held in possession without just and true titles shall be restored to us, as it belongs to us, so that, reserving before everything that which to us or our viceroys, courts, or governors may appear necessary for plazas, commons, public lands, pastures, and territory of the inhabited villages and towns in view of their present condition as well as of the future and their possible expansion, and granting to the Indians that of which they may reasonably have need for working the land and making their crops and for their education, confirming them in that which they now have and giving to them in addition that which is necessary, all the rest of the lands may remain and be free and unencumbered, to be disposed of according to our will. Wherefore we order and direct the viceroys and presidents of the pretorial courts that when it appears proper to them, they shall announce a suitable limit of time, in order that those in possession may exhibit before them and the officers of their courts which may name the titles of the lands, plantations, farms, stock farms, protecting those who are in possession with good title and guaranties or with just prescription, and they shall return and restore to us the remaining land to be disposed of according to our will."

Further quotation from the same laws confirms the Indians in respect to their titles. "We order that the sale, cultivation, and adjustment of lands shall be made with such precautions that to the Indians shall be left the lands which may belong to them, not only as individuals, but also as communities." Bk. 4, title 12, Law 18 (1642). "No one shall be allowed to enter into a composition of lands unless he has possessed them for ten years, even though he may allege that he has so possessed them, because this pretext alone must not be sufficient, and the communities of Indians shall be admitted to composition in preference to the other particular persons, granting to them every convenience." Bk. 4, title 12, Law 19 (1646). "It is just that the Indians shall have time to work their properties and those of the community, and that the viceroys and governors shall proclaim that which may be necessary, to the end that they can come to their farms." Bk. 4, title 1, Law 23 (1609).

By the Laws of the Indies, comprehensive provision was made, not only confirming title to lands held by the Indians individually and in common, but establishing regulations for their better government, and especially for the protection of their property rights, with ample provision for access to the courts.

By a Royal Decree of October 15, 1754, respecting public lands, which forms the basis of many Mexican titles, the following instructions were promulgated: "The judges and officers in whom is delegated the jurisdiction over the same and composition of Crown lands shall act with lenity, forbearance, and moderation, with verbal, and not judicial, process, in questions of lands possessed by Indians, and of other lands which they (Indians) may need, especially for their work, cultivation, and stock raising; since in regard to lands of communities and those granted to their pueblos for pastures and common lands, nothing new must be done, maintaining them in possession thereof and restoring to them those that have been taken from them and giving them more land as the exigencies of the population require, and using no rigor in regard to those held by the Spaniards and people of other castes, keeping in mind the provisions of Laws 14, 15, 17, 18, and 19, title 12, bk. 4, of the Compilation of the Indies." The decree also provided that, in the absence of title papers, "it shall be sufficient to prove ancient possession as a title by just prescription." 1 Legislacion Mexicana, Mexico, 1876, pp. 13, 14.

The failure to aver the present existence of title in plaintiff pueblo by deed or other writing is not controlling, since its inhabitants have occupied and used the lands in question from time immemorial, and their title had been expressly recognized and confirmed by the Spanish and Mexican governments. Referring to the character and validity of the title of the Indian pueblos within the territory ceded by Mexico, the court, in *United States* v. *Pico,* 5 Wall. 536, 540, 18 L. ed. 695, 696, said: "The existence of the pueblo and the assignment to it of the land in question by the officers of the Mexican government are fully established by the documentary evidence in the case. The objection of the appellants is founded upon the absence of

any transfer of the title to the pueblo by deed or other writing. But such transfer was not essential, nor was it usual. A pueblo once formed and officially recognized became entitled, under the laws of Mexico, to the use of certain lands, for its benefit and the benefit of its inhabitants, and the lands were, upon petition, set apart and assigned to it by the government. No other evidence of title than such assignment was required, nor was any other given."

That the inhabitants of the pueblo of Santa Rosa were citizens of Mexico at the time of the cession to the United States seems to be indisputably established. The question of the status of Indian citizenship in Mexico prior to the cession is exhaustively reviewed in the case of *United States* v. *Ritchie,* 17 How. 525, 15 L. ed. 236. The court, speaking of the power of Indians under the government of Mexico to take and hold property, said: "In answer to the first objection, we are referred to the plan of Iguala, adopted by the revolutionary government of Mexico, 24th February, 1821, a short time previous to the subversion of the Spanish power in that country, in which it is declared that 'all the inhabitants of New Spain, without distinction, whether Europeans, Africans, or Indians, are citizens of this monarchy, with a right to be employed in any post according to their merit and virtues;' and that, 'the person and property of every citizen will be respected and protected by the government.' * * * The Indian race having participated largely in the struggle resulting in the overthrow of the Spanish power, and in the erection of an independent government, it was natural that, in laying the foundations of the new government, the previous political and social distinctions in favor of the European or Spanish blood should be abolished, and equality of rights and privileges established. Hence the article to this effect in the plan of Iguala, and the decree of the first congress declaring the equality of civil rights, whatever may be their race or country. These solemn declarations of the political power of the government had the effect, necessarily, to invest the Indians with the privileges of citizenship as effectually as had the Declaration of Independence of the United States, of 1776, to invest all those per-

sons with these privileges residing in the country at the time, and who adhered to the interests of the colonies. *Inglis* v. *Sailor's Snug Harbour*, 3 Pet. 99, 121, 7 L. ed. 617, 625.   *   *   * But as a race, we think it impossible to deny, that, under the Constitution and laws of the country, no distinction was made as to the rights of citizenship, and the privileges belonging to it, between this and the European or Spanish blood.   Equality between them, as we have seen, has been repeatedly affirmed in the most solemn acts of the government."

Concluding, as we must, that the inhabitants of the pueblo of Santa Rosa were citizens of Mexico and possessed of a valid communal title in the lands embraced therein, we come to a consideration of the effect, if any, the transfer of sovereignty to the United States had upon those rights.   By article 9 of the Treaty of Guadalupe Hidalgo, it was provided that "the Mexicans who, in the territories aforesaid, shall not preserve the character of citizens of the Mexican Republic,   *   *   *   shall be incorporated into the Union of the United States and be admitted, at the proper time (to be judged of by the Congress of the United States), to the enjoyment of all the rights of citizens of the United States according to the principles of the Constitution; and in the meantime shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction." [9 Stat. at L. 930.]

The Gadsden Treaty, under which the pueblo of Santa Rosa and its inhabitants passed from the sovereignty of Mexico to the United States, provides: "Art. 5.   All the provisions of the eighth and ninth, sixteenth and seventeenth articles of the Treaty of Guadalupe Hidalgo, shall apply to the territory ceded by the Mexican Republic in the first article of the present treaty, and to all the rights of persons and property, both civil and ecclesiastical, within the same, as fully and as effectually as if the said articles were herein again recited and set forth." [10 Stat. at L. 1035.]

It may be suggested that the foregoing treaty provisions are merely declaratory of the general principles of international

law, preserving, in case of change of sovereignty by cession, all the personal and property rights of the inhabitants of the ceded territory. Whatever rights were secured to plaintiff by Mexico prior to cession passed and are granted protection by the new sovereignty. Title respected by treaty obligations is peculiarly sacred. It rests not only on the pledge of protection by the new sovereignty, but upon a solemn guaranty to the old sovereignty that existing personal and property rights shall remain undisturbed. "The rights of private property, so far from having been impaired by the change of sovereignty and jurisdiction, were fully secured by the law of nations, as well as by treaty stipulation." *Newhall* v. *Sanger,* 92 U. S. 761, 763, 23 L. ed. 769, 770.

It will be observed that the Treaty of Guadalupe Hidalgo protected all persons, corporations, and communities in their rights of property. This included pueblos which, by law and custom, had become vested with interests in lands under the former government. It expressly provided for the protection of the rights of the inhabitants of the ceded territory in their persons and property, and there is nothing from which the inference can be adduced that any distinction was intended with reference to property claimed by towns under the Mexican government. "By the laws of Mexico, in force at the date of the acquisition of the country, pueblos or towns were entitled, for their benefit and the benefit of their inhabitants, to the use of lands constituting the site of such pueblos and towns, and of adjoining lands, within certain prescribed limits. This right appears to have been common to the cities and towns of Spain from an early period in her history, and was recognized in the laws and ordinances for the settlement and government of her colonies on this continent. These laws and ordinances provided for the assignment to the pueblos or towns, when once established and officially recognized, for their use and the use of their inhabitants, of 4 square leagues of land. It may be difficult to state with precision the exact nature of the right or title which the pueblos held in these lands. It was not an indefeasible estate; ownership of the lands in the pueblos could not in strict-

ness be affirmed.    It amounted in truth to little more than a
restricted and qualified right to alienate portions of the land to
its inhabitants for building or cultivation, and to use the remain-
der for commons, for pasture lands, or as a source of revenue,
or for other public purposes.    This right of disposition and
use was, in all particulars, subject to the control of the govern-
ment of the country."    *Townsend* v. *Greeley,* 5 Wall. 326, 336,
18 L. ed. 547, 549.

It logically follows that there existed, and still exists, in these
pueblos a communal right of property which, at most, could only
be controlled by specific act of the government itself.    It is
inconceivable, however, that this controlling power of the gov-
ernment should extend beyond the exercise of the functions of
guardianship, for their title to the lands antedates the sover-
eignty of the United States, and is expressly protected and con-
firmed by treaty.    By no rule of sovereign prerogative existing
in our form of constitutional government could these people be
devested of their lands without due compensation.    Congress
has never legislated in respect of the property rights of plaintiff
pueblo.    Until it does, its administrative officers are without
authority to interfere in any respect with those rights.    It will
not do to say that authority exists under the general legislation
of Congress with respect to the Indians and the Indian country.
It has never been the policy to so treat the Indian pueblos which
came to us with the cession from Mexico.    The title to most
of them has been confirmed by Congress under a policy entirely
foreign to that adopted in dealing with the savage, nomadic
Indian tribes.    The laws of Spain, and later of Mexico, made
no distinction between the Papago Indian pueblos and those
within the present limits of the State of New Mexico which have
been confirmed in their rights, which were recognized by this
government to have been acquired long prior to the transfer of
sovereignty from Mexico to the United States.

It follows that by the obligations of the treaty of cession,
we stipulated not only to protect these former citizens of Mexico
in their persons and property, but to accord to them the same
treatment with respect thereto as had been accorded them under

the former sovereignty.  To deprive them now of their lands would be to deprive them of property rights of which they have been vested from time immemorial, and which were recognized as such both by Spain and Mexico, and so recognized by this government in respect of numerous other Indian pueblos similarly situated.

It is no argument that because recently Congress has made certain provisions looking to the exercise of limited guardianship over these people that the administrative officers of the government may, upon the theory that they are wards of the government, treat their lands as public domain and open them to settlement.  There is nothing inconsistent with the theory that an Indian, though a ward of the government, may possess title to lands.  The acts of guardianship in this instance place no power in the administrative officers of the government to interfere in any manner with the property of the ward, further than to manage and control it for the benefit of the ward.  "As before indicated, by a uniform course of action beginning as early as 1854 and continued up to the present time, the legislative and executive branches of the government have regarded and treated the pueblos of New Mexico as dependent communities, entitled to its aid and protection, like other Indian tribes; and, considering their Indian lineage, isolated and communal life, primitive customs, and limited civilization, this assertion of guardianship over them cannot be said to be arbitrary, but must be regarded as both authorized and controlling."  *United States* v. *Sandoval,* 231 U. S. 28, 47, 58 L. ed. 107, 114, 34 Sup. Ct. Rep. 1.

Even assuming that general acts of Congress relating to the guardianship of the Indians might apply to plaintiff pueblo, it would still hardly be contended that power exists in the officers of the government to arbitrarily devest them of their lands.  Even the savage, nomadic tribes of American Indians, with whom the ancient Mexican Pueblo Indians seem to have little or no racial connection, have been held to possess such a title or interest in their lands as could only be devested by treaty or act of Congress, and then only upon due compensation.  No

treaty or act of Congress exists, or ever has existed, touching the status of these Indians in respect of their title to the lands possessed, used, and occupied by them from time immemorial.

While in the *Sandoval Case,* the court distinguished the decision in *United States* v. *Joseph,* 94 U. S. 614, 24 L. ed. 295, we assume it related only to the question under consideration of the power of Congress to prohibit the introduction of intoxicating liquor into an Indian pueblo, holding it to be Indian country. This, we conceive, detracts nothing from the authority of the Joseph decision as fixing the distinction between 'the titles to lands held by Pueblo Indians and those occupied by the nomadic tribes. On this point Mr. Justice Miller, speaking for the court, said: "Turning our attention to the tenure by which these communities [pueblo Indians] hold the land on which the settlement of defendant was made, we find that it is wholly different from that of the Indian tribes to whom the act of Congress applies. The United States have not recognized in these latter any other than a passing title with right of use, until by treaty or otherwise that right is extinguished. And the ultimate title has been always held to be in the United States, with no right in the Indians to transfer it, or even their possession, without consent of the government. It is this fixed claim of dominion which lies at the foundation of the act forbidding the white man to make settlement on the lands occupied by an Indian tribe. The Pueblo Indians, on the contrary, hold their lands by a right superior to that of the United States. Their title dates back to grants made by the government of Spain before the Mexican Revolution,—a title which was fully recognized by the Mexican government, and protected by it in the Treaty of Guadalupe Hidalgo, by which this country and the allegiance of its inhabitants were transferred to the United States."

But it is urged that plaintiff pueblo is not a corporation, and, therefore, not entitled to maintain this action. Passing over much interesting history tending to establish its corporate entity by immemorial prescription, we think it is a corporation under the laws of the state of Arizona. When General Kearney was

military governor of New Mexico, a statute entitled, "An Act to Enable Pueblo Indians to Bring and Defend Actions," was passed, in which it was provided "that the inhabitants within the Territory of New Mexico, known by the name of the Pueblo Indians, and living in towns or villages built on lands granted to such Indians by the laws of Spain or Mexico, and conceding to such inhabitants certain lands and privileges, to be used for the common benefit, are severally hereby created and constituted bodies politic and corporate, and shall be known in law by the name of the 'Pueblo de ————,' (naming it), and by that name they and their successors shall have perpetual succession; sue and be sued, plead and be impleaded, bring and defend in any court of law or equity, all such actions, pleas, and matters whatsoever, proper to recover, protect, reclaim, demand, or assert the right of such inhabitants, or any individual thereof, to any lands, tenements, or hereditaments, possessed, occupied, or claimed contrary to law by any person whatsoever, and to bring and defend all such actions, and to resist any encroachment, claim, or trespass made upon such lands, tenements, or hereditaments, belonging to said inhabitants, or to any individual." Laws of New Mexico, 1851–1852.

In 1850, New Mexico was created a Territory (9 Stat. at L. 446, chap. 49) by which general legislative authority was vested in the territorial legislature. The first legislature enacted "that all laws that have previously been in force in this Territory that are not repugnant to, or inconsistent with, the Constitution of the United States, the organic law of the Territory, or any act passed at the present session of the legislative assembly, shall be and continue in force, except in Kearney's Code the law concerning registers of land." Laws of New Mexico of 1852.

This brought the Kearney Act forward into the laws of New Mexico. The Papago Indian lands here in question were included in the Gadsden Purchase of 1854, and Congress, by Act of August 4, 1854 (10 Stat. at L. 575, chap. 245), enacted "that, until otherwise provided by law, the territory acquired under the late treaty with Mexico, commonly known as the

Gadsden Treaty, be, and the same is hereby, incorporated within the Territory of 'New Mexico,' subject to all the laws of said last-named territory."

By the Act of Congress of February 24, 1863 (12 Stat. at L. 664, chap. 56), the Territory of Arizona was created out of territory formerly embraced within New Mexico. The act continued in force the act creating the Territory of New Mexico, "together with all legislative enactments of the Territory of New Mexico not inconsistent with the provisions of this act," which "are hereby extended to and continued in force in the said Territory of Arizona, until repealed or amended by future legislation." We have been unable to find anything in the Constitution or laws of Arizona repealing or in any manner affecting the corporate status of Indian pueblos as fixed by the Kearney statute. The validity of the Kearney Act was upheld in *Leitensdorfer* v. *Webb*, 20 How. 176, 15 L. ed. 891.

Nor is this a suit against the United States to control the discretionary functions of its officials. This is not public domain of the United States, in that it comes within the general acts of Congress imposing upon the Secretary of the Interior general supervisory control over the public lands. It is an Indian pueblo of the class of the New Mexican pueblos in which the government has recognized and confirmed title existing at the date of cession and protected by the treaty. Indeed, the only act of Congress that has been called to our attention affecting directly the title of Papago lands was in effect a recognition of their title. The Act of 1882 (22 Stat. at L. 299, chap. 394) granted a right of way to the Arizona Southern Railroad Company across the Papago Reservation, but specifically provided "that the consent of the Indians occupying said reservation be first obtained, and such compensation as may be fixed by the Secretary of the Interior be paid to him by the said railroad company, to be expended by him for the benefit of the said Indians." The act is significant of guardianship, but negatives any disposition on the part of the government to assert ownership. No question of the boundary is here involved, since the boundaries set forth in the bill are concededly correct under

the admissions of the motion to dismiss. Hence, defendant officers are acting totally without their jurisdiction. In such cases the courts will not hesitate to interfere. *Gaulthier* v. *Morrison,* 232 U. S. 452, 58 L. ed. 680, 34 Sup. Ct. Rep. 384; *Lane* v. *Wade,* 234 U. S. 525, 58 L. ed. 1440, 34 Sup. Ct. Rep. 965.

We come now to the claim of counsel for the government, that plaintiff is barred by its failure to assert its title before the court of private land claims or before the Land Commission created by the Act of Congress of July 22, 1854 (10 Stat. at L. 308, chap. 103). The Act of 1854 was limited to Mexican land grants within the limits of California. It contained a provision for the absolute forfeiture to the United States of lands claimed if the grantee failed to present his claim to the Commission before a specified date. This forfeiture provision was held valid and enforceable. *Botiller* v. *Dominguez,* 130 U. S. 238, 32 L. ed. 926, 9 Sup. Ct. Rep. 525; *Barker* v. *Harvey,* 181 U. S. 481, 45 L. ed. 963, 21 Sup. Ct. Rep. 690. But this law has no present application, since the lands in question are not situated in California, and hence were not within the jurisdiction of the Commission.

The Act of March 3, 1891 (26 Stat. at L. 854, chap. 539), creating the court of private land claims, provided, among other things:

"Sec. 6. That it shall and may be lawful for any person or persons or corporation, or their legal representatives, claiming lands within the limits of the territory derived by the United States from the Republic of Mexico and now embraced within the Territories of New Mexico, Arizona, or Utah, or within the States of Nevada, Colorado, or Wyoming, by virtue of any such Spanish or Mexican grant, concession, warrant, or survey as the United States are bound to recognize and confirm by virtue of the treaties of cession of said country by Mexico to the United States which at the date of the passage of this act have not been confirmed by act of Congress, or otherwise finally decided upon by lawful authority, and which are not already

complete and perfect, in every such case to present a petition, in writing, to the said court," etc.

"Sec. 8. That any person or corporation claiming lands in any of the States or Territories mentioned in this act under a title derived from the Spanish or Mexican government that was complete and perfect at the date when the United States acquired sovereignty therein, shall have the right (but shall not be bound) to apply to said court in the manner in this act provided for other cases for a confirmation of such title; and on such application said court shall proceed to hear, try, and determine the validity of the same and the right of the claimant thereto, its extent, location, and boundaries, in the same manner and with the same powers as in other cases in this act mentioned."

It will be observed that it was left optional with persons claiming complete title to come into the court of private land claims. No penalty or forfeiture was imposed upon such claimant for failure to submit himself to the jurisdiction of the court. In *Ainsa* v. *New Mexico & A. R. Co.* 175 U. S. 76, 44 L. ed. 78, 20 Sup. Ct. Rep. 28, it was held that Mexican or Spanish grants complete at the time of cession were confirmed by the treaty itself, and needed no confirmation by Congress. The reason for making the presentation of completed claims optional was stated in *Richardson* v. *Ainsa,* 218 U. S. 289, 54 L. ed. 1044, 31 Sup. Ct. Rep. 23, as follows: "But the considerations mentioned in the case cited [*Botiller* v. *Dominguez*] did not prevent the United States in the Act of March 3, 1891, from leaving the holders of perfected titles free not to present them to the court, as they were required to do in earlier statutes. The good faith of the United States was pledged to respect the Mexican titles. It recognized in the Act of 1891 that holders of such titles need not go into the land claims court to get them confirmed, and we should be slow to suppose that it meant to make a doubt in the Department of Justice as to the validity of a perfect title a ground for cutting down what otherwise it was bound to protect, and did, by the statute, leave intact."

With this distinction before us, it is clear that plaintiff lost

nothing by failure to assert its title before the land claims court. Whatever title plaintiff has, it acquired long prior to the cession from Mexico. Its status was in no respect affected by the change of sovereignty. Nor, as we have observed, has it been changed by act of Congress. Its communal pueblo or village title was as little subject to impairment by change of sovereignty as that of a private individual Spanish or Mexican grantee. The court below laid stress upon the principle that plaintiff, being a pueblo or village, a mere agency of the government, it lay within the sovereign power at any time to put an end to its political character or existence. But this is an assumption without a premise. No such thing has been attempted; and, so long as the pueblo continues, its property rights remain subject to protection by the laws of the land, with a duty of enforcement resting upon the courts. Indeed, its peculiar origin, antedating every national sovereignty under which it has existed, may well distinguish it from the ordinary municipality with authority to exercise only those limited powers conferred by the express terms of a corporate charter, granted by the State. It is more in the nature of a corporation by immemorial prescription recognized by the State, but exercising governmental functions of its own, independent of any express statutory regulations prescribed by the State.

It is unnecessary, however, to consider the more difficult question of the extent of the power of Congress to control plaintiff's title or abolish its corporate existence by legislative enactment, since it has not been attempted. The Land Department fell into error in placing the Papagos in the same classification with the original nomadic North American Indian tribes and attempting to apply to their property the general law affecting Indian lands and property. We find plaintiff, at the time of the cession from Mexico, to be a pueblo of the same legal status as the New Mexican pueblos whose title was recognized and confirmed in fee simple by the Act of Congress of December 22, 1858 (11 Stat. at L. 374, chap. 5). It follows, therefore, that, whatever power Congress may have to control plaintiff's land, no such power has been asserted, and this power cannot be as-

sumed by the Land Department to the extent of opening the land to settlement and disposing of mineral rights therein.

The decree is reversed with costs, and the cause is remanded with directions to enter a decree restraining defendants from offering for entry or listing for entry or sale as part of the public domain of the United States any of said lands under any land or mineral land law of the United States, and requiring, in so far as lies within their power or control, the correction of the records of the Land Department to prevent in as large degree as possible any further infringement upon the property rights of plaintiff.

*Reversed and remanded.*

An appeal to the Supreme Court of the United States was allowed May 12, 1917.